[Cite as *Brownlee v. Brownlee*, 2012-Ohio-1539.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos.   97037 and 97105**

# ROSEMARY BROWNLEE

PLAINTIFF-APPELLANT

vs.

# JOHN DAVID BROWNLEE

DEFENDANT-APPELLEE

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART,
## AND REMANDED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Domestic Relations Division
Case No. D-308513

**BEFORE:**    Boyle, P.J., E. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**    April 5, 2012

**ATTORNEYS FOR APPELLANT**

Gregory J. Moore
Anne C. Fantelli
Stafford & Stafford Co., L.P.A.
55 Erieview Plaza, 5th Floor
Cleveland, Ohio    44114

**FOR APPELLEE**

John David Brownlee, pro se
219 Legacy Drive
Highland Heights, Ohio    44143

MARY J. BOYLE, P.J.:

**{¶1}** Plaintiff-appellant, Rosemary Brownlee, appeals various judgments issued by the Domestic Relations Division of the Cuyahoga County Common Pleas Court relating to her divorce from defendant-appellee, John Brownlee. She raises six assignments of error for our review:

"[1.] The trial court erred and/or abused its discretion in its calculation and determination of the appellee's child support obligation; by failing to impute income to the appellee for the period of time he was underemployed and in regard to prospective support; in determining the parties' gross annual incomes.

"[2.] The trial court erred and/or abused its discretion in determining the appellee's temporary and prospective child support obligations; and arrearages.

"[3.] The trial court erred and/or abused its discretion by failing to find the appellee in contempt, by modifying the temporary order, by failing to enforce its prior order, and by failing to award the appellant attorney fees.

"[4.] The trial court erred and/or abused its discretion in its allocation of the tax dependency exemptions for the parties' minor children; and in adopting the magistrate's decision of January 27, 2011.

"[5.] The trial court erred and abused its discretion by issuing the judgment entries on July 15 or 18, 2011, and July 20, 2011 without holding a hearing.

"[6.] The trial court decisions are against the manifest weight of the evidence."

{¶2}   We find merit to her fourth assignment of error regarding the trial court's allocation of the tax dependency exemptions.   We also find merit, in part, to her fifth assignment of error regarding the trial court's failure to hold an evidentiary hearing relating to a disputed settlement agreement.   Thus, we affirm in part, reverse in part, and remand.

## Procedural History and Factual Background

{¶3}   The parties, both doctors, were married in September 1993.   They had five children born as issue of their marriage: J. in April 1995, M. in March 1998, E. in September 1999, D. in June 2002, and M. in January 2005.   Rosemary filed for divorce in January 2006, but the parties continued to live together in the marital home until late October 2006, when John moved out of the home.

{¶4}   Rosemary moved for temporary support in May 2006, which the trial court granted.   Because the parties were still living together at that time, the trial court ordered that they share all expenses equally.   Rosemary was to "write the initial checks for payment" of the expenses, and John was to "reimburse her for his one-half share."

{¶5}   Around the same time that John moved out of the marital home, he was terminated from his employment due to substance abuse issues.   He immediately moved the trial court to modify its temporary support order.   But rather than rule on the motion at that time, the trial court set it to be heard at the final divorce hearing.

{¶6} John was rehired by his employer in December 2007 after he completed a rehabilitation program and had his medical license reinstated.

{¶7} Before the final hearing, the parties entered into a shared parenting agreement that resolved all issues regarding the children except child support and the allocation of tax dependency exemptions. The parties also split all personal property by agreement prior to trial and stipulated that (1) there was $30,000 equity in the marital home that wife was retaining, (2) they both had IRAs in the amount of $7,000 that each would be retaining, (3) John had an Ameritrade account amounting to $26,351, (4) John had a variable adjustable life insurance policy that was worth $17,315, (5) Rosemary had a pension plan from her place of employment in the amount of $32,692, (6) Rosemary had a profit sharing plan with her employer amounting to $283,697, and (7) John had a retirement plan worth $80,940.

{¶8} The divorce trial was heard over a period of five days in October 2008. The trial court awarded Rosemary the marital residence, her IRA, her pension plan, her profit sharing plan, her vehicle worth $22,875, and her personal property, for a total of $376,264. The trial court awarded John his IRA, his Ameritrade account, his life insurance policy, his retirement plan, $15,000 that had been advanced to him out of marital funds during the pendency of the divorce after he lost his job, his personal property, and Cleveland Browns PSLs, for a total of $146,606. The trial court noted that although the property division was not equal, it was equitable because Rosemary "was

forced to provide for the full support of the children during John's one year of unemployment." The trial court further ordered that each party be responsible for any debt in his or her name.

{¶9} Regarding the amount of arrearage John owed Rosemary for temporary support during the pendency of the divorce, the trial court divided the calculation into three separate time frames. The first time frame began when the temporary support order became effective (May 9, 2006), and ended when John moved out of the marital home (November 1, 2006). As for the second two time periods, the trial court granted John's motion to modify temporary support that he filed in November 2006, finding that a modification was warranted. The trial court found that the second time frame started when John moved out of the marital home and lost his job (November 1, 2006), and ended when he was rehired by his former employer (December 17, 2007). The third time frame started the day John was rehired and ended on the date of trial.

{¶10} As for the first time period, the trial court found that Rosemary established that from May 2006 to November 2006, John owed her $24,261 for bills that she paid during that time. But the trial court credited John $5,600 (for two mortgage payments that he made) and $10,930 (for three checks he had written Rosemary), concluding that John owed Rosemary $10,532 as of November 1, 2006.

{¶11} Regarding the second time frame, when John was unemployed, the trial court found that the reason for John's loss of employment was "clearly and solely" his

fault, but also found that "through his efforts to deal with his problems during this period of time he [had] reestablished his life and career." As for John's income during this time, the trial court found that he had "accumulated income" of $38,289 available to him. This income came from a bonus that John had received, as well as additional funds that he had placed in the account. Based on this number, the trial court calculated John's child support obligation for all five children to be $231.37 per month from November 1, 2006 to December 17, 2007 (13.5 months), for a total arrearage of $3,123.50.

{¶12} Finally, for the third time frame beginning when John was rehired and ending on the date of trial, Rosemary had earned $360,333 in 2007, and John had been hired back by his former employer with a $200,000 annual salary. Based on these salaries, the trial court determined John's child support obligation for all five children amounted to $1,358 per month (based on a straight guideline calculation for the maximum income under the guidelines, which is $150,000). But the trial court found that because the parties' combined income was over $150,000 per year, an upward deviation was warranted due to the children's parochial school enrollment. The trial court found that the monthly enrollment costs amounted to $1,409, and that it was in the children's best interest for each parent to pay one-half of such costs. Thus, the trial court ordered John to pay $2,076.59 per month in child support, making it effective the date John was rehired by his former employer, December 17, 2007 (this amount is also the prospective child support obligation). The trial court found that from the date John

was rehired to the date of the final divorce hearing (11.5 months), John owed $23,880.79 in child support. But the trial court credited John $21,670 for payments he made directly to Rosemary during this time. Thus, the total arrearage for the third time frame amounted to $2,210.79.

{¶13} The trial court concluded that the total arrearage that John owed Rosemary amounted to $15,866. But the trial court waived the arrearage because it found that Rosemary received "a disproportionate division of property."

<u>Temporary and Prospective Support</u>

{¶14} In her first and second assignments of error, Rosemary argues that the trial court erred in calculating temporary and prospective child support. Rosemary maintains that when John lost his job, he was "voluntarily unemployed" and as such, the trial court should have imputed potential income to him. Rosemary also contends that after John was rehired by his former employer, the trial court erred by using $200,000 as his salary, as well as using it for his salary for his future child support obligation, because she argues that his employment history establishes that his income potential is much higher. But even accepting $200,000 as John's annual salary for the calculation, Rosemary contends that the trial court erred by not deviating John's child support obligation upward even more than it already did due to the factors set forth in R.C. 3119.04(B).

{¶15} "A trial court's decision regarding a child support obligation will not be reversed on appeal absent an abuse of discretion." *Snyder v. Snyder*, 8th Dist. No.

95421, 2011-Ohio-1372, ¶ 42, citing *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108 (1997). An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Moreover, as long as the decision of the trial court is supported by some competent, credible evidence, the reviewing court will not disturb it. *Masitto v. Masitto*, 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986).

{¶16} To determine the proper amount of child support, R.C. 3119.01(C)(5) provides in pertinent part that "income" means either of the following:

"(a) For a parent who is employed to full capacity, the gross income of the parent;

"(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent."

{¶17} Before a trial court may impute "potential income" to a parent for child support purposes, "R.C. 3119.01(C)(11) requires the trial court to first find that the parent is voluntarily unemployed or underemployed." *Smart v. Smart*, 3d Dist. No. 17-07-10, 2008-Ohio-1996, ¶ 21, citing *Rock v. Cabral*, 67 Ohio St.3d 108, 616 N.E.2d 218 (1993). Whether a parent is voluntarily unemployed or underemployed is a factual determination to be made by the trial court based upon the circumstances of each particular case. *Rock* at 112.

{¶18} If the court determines that a parent is "voluntarily unemployed or underemployed," then it may include

imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria: (i) The parent's prior employment experience; (ii) The parent's education; (iii) The parent's physical and mental disabilities, if any; (iv) The availability of employment in the geographic area in which the parent resides; (v) The prevailing wage and salary levels in the geographic area in which the parent resides; (vi) The parent's special skills and training; (vii) Whether there is evidence that the parent has the ability to earn the imputed income; (viii) The age and special needs of the child for whom child support is being calculated under this section; (ix) The parent's increased earning capacity because of experience; [and] (x) Any other relevant factor. R.C. 3119.01(C)(11).

{¶19} After a review of the record, we find that the trial court did not abuse its discretion regarding John's income during the time that he was unemployed. John testified that he had a history of "alcoholism and chemical dependency and had been sober for over 11 years" when he relapsed in 2006. He explained that he began writing prescriptions for Percocet for himself. He wrote three prescriptions for himself before he was arrested for it. After his arrest, he called his employer and told them what he did. He lost his medical license and was fired from his job. He entered a 28-day rehabilitation program and eventually regained his medical license. When he did, he was rehired by his former employer. Although the trial court found that John's job loss was entirely his fault, it also obviously recognized that substance abuse is an illness and that John's efforts at "reestablishing his life and career" were admirable.

{¶20} Rosemary cites to *Drucker v. Drucker*, 8th Dist. No. 76139, 2000 WL 739520 (June 8, 2000), and *Groves v. Groves*, 12th Dist. No. CA2008-06-059, 2009-Ohio-931, claiming they support her position that John was "voluntarily

unemployed" because his lack of employment was solely his fault. We find these cases to be distinguishable.

**{¶21}** In *Groves*, the father lost his employment due to the collapse of his mortgage lending business, and he "was expected to plead guilty to federal criminal charges to be sentenced to a term of imprisonment." John's criminal charges here were related to his substance abuse issues, which is an illness. Further, John rehabilitated himself and regained his employment within a reasonable amount of time.

**{¶22}** In *Drucker*, the father was unemployed because he had moved to Florida, where he was not licensed to practice law. The court determined that the record did not reflect any reason that he "could not have become licensed to practice law in Florida," and his "voluntary failure to obtain a license to practice law would not support a finding that his unemployment was involuntary." *Id.* at *2. The court further determined that the father's history of mental illness and chemical dependency "was treatable, and there was no medical evidence he could not return to his former position as an attorney." *Id.* Here, however, John treated his chemical dependency and returned to work in a commendable time frame.

**{¶23}** We further find that the trial court did not abuse its discretion when it used the salary that John was paid when he returned to work (i.e., $200,000), rather than the salary he earned prior to his relapse (John admitted at trial that he earned $257,660 as of October 2006 when he lost his job). The trial court was within its discretion to do so,

and we cannot say that it was an unreasonable or arbitrary decision based on the circumstances of John's unemployment.

**{¶24}** We also find no error on the part of the trial court in its upward deviation of John's child support obligation.

**{¶25}** R.C. 3119.04(B) provides that

> If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

**{¶26}** In determining child support when parents income exceeds $150,000, R.C. 3119.04(B) "leaves the determination entirely to the court's discretion." *Cyr v. Cyr*, 8th Dist. No. 84255, 2005-Ohio-504, ¶ 54. R.C. 3119.04(B) expressly prohibits a trial court *from awarding less than* the amount computed under the basic child support schedule and applicable worksheet corresponding to a combined gross income of $150,000 unless the court finds that "it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount." This court has consistently held that in determining child support obligations pursuant to R.C. 3119.04, trial courts must

proceed on a case-by-case basis and generally do not have to state reasons for doing so. *Keating v. Keating*, 8th Dist. No. 90611, 2008-Ohio-5345, ¶ 84. Further, "the statute does not require any explanation of its decision unless it awards less than the amount awarded for combined incomes of $150,000." *Cyr* at ¶ 56; *see also Pruitt v. Pruitt*, 8th Dist. No. 84335, 2005-Ohio-4424; *Seibert v. Tavarez*, 8th Dist. No. 88310, 2007-Ohio-2643.

**{¶27}** Here, the trial court found that based on John's income of $200,000 and Rosemary's income of $360,533, John's base child support obligation was $1,358 per month (the maximum support obligation for five children based on a combined income of $150,000; $30,931 per year, multiplied by John's 35.3 percent obligation). But the trial court found that because the parties had always enrolled their children in parochial school, it was in the children's best interest to continue doing so. Accordingly, the trial court ordered that both parties should be responsible for half the cost of sending the children to parochial school, and deviated John's child support obligation upward to $2,076.56 per month to reflect that cost. It was wholly within the trial court's discretion to do so and we find no abuse of that discretion.

**{¶28}** Accordingly, we overrule Rosemary's first and second assignments of error.

Contempt of Court and Attorney Fees

**{¶29}** In her third assignment of error, Rosemary argues that the trial court erred by failing to find John in contempt of court and by failing to award her attorney fees.[1] Our standard of review regarding these issues is limited to whether the trial court abused its discretion. *Fisher v. Fisher*, 8th Dist. No. 95821, 2011-Ohio-5251, ¶ 16; *Christescu v. Christescu*, 8th Dist. No. 90304, 2008-Ohio-3540, ¶ 35. We find her arguments to be unfounded.

**{¶30}** In domestic relations matters, trial court's have wide latitude to do what is equitable upon the facts and circumstances of each case. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989). After a thorough review of the record in this case, we do not find anything in the record to indicate that the trial court acted unreasonably, arbitrarily, or unconscionably for failing to sua sponte find John in contempt of court. For 13.5 months of the period of temporary support, John was unemployed due to his substance abuse issues. And from February 2008, soon after he was rehired, he voluntarily paid Rosemary $2,000 per month until the trial in October of that year.

**{¶31}** We further find no abuse of discretion on the part of the trial court for denying Rosemary's motion for attorney fees. Under R.C. 3105.73(A),

> a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support,

---

[1] Rosemary also raises other issues within this assignment of error, but she raised these same issues in her first and second assignments of error, which we already addressed.

the conduct of the parties, and any other relevant factors the court deems appropriate.

**{¶32}** Rosemary asked for attorney fees in her complaint for divorce. But she testified near the end of the final hearing — after five days of testimony — that she was not requesting the court to order John to pay her attorney fees. After this court dismissed the first appeal in this matter in January 2010 (for lack of final appealable order because the trial court failed to allocate the tax dependency exemptions in the final judgment entry), Rosemary did move for attorney fees (in March 2011) incurred in the entire litigation. But again, based on the record before us, we find no abuse of discretion on the part of the trial court. Both parties shared equally in prolonging this divorce. Indeed, after this court dismissed the first appeal, both parties filed numerous motions with the trial court — over a period of one and one-half years — regarding all kinds of matters. Further, Rosemary earns upward of $360,000, and was awarded a significant portion of the marital property. Thus, we find the trial court's ruling to be equitable.

**{¶33}** Accordingly, Rosemary's third assignment of error is overruled.

Tax Dependency Exemptions

**{¶34}** In her fourth assignment of error, Rosemary argues that the trial court erred when it adopted the magistrate's decision regarding the allocation of the tax dependency exemptions for the five children regarding 2006 and 2008 (which also included future years). As with other domestic relations issues, a trial court's decision awarding the tax

dependency exemption to a party is reviewed for an abuse of discretion. *Corple v. Corple*, 123 Ohio App.3d 31, 702 N.E.2d 1234 (7th Dist. 1997).

> **{¶35}** If parents do not agree who should receive the tax dependency exemptions, then the trial court must review all of the relevant factors, including  any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children.   R.C. 3119.82.

**{¶36}** The judge who presided over the divorce trial had retired by the time this court dismissed the parties' first appeal for lack of a final appealable order.   Upon remand, the case was assigned to a new judge.   A magistrate, however, presided over the hearing regarding who should receive the tax dependency exemptions.

**{¶37}** The magistrate took judicial notice of the findings contained in the November 2008 judgment entry of divorce and the parties' shared parenting plan incorporated into the divorce.   The magistrate further obtained information from the parties' 2006 and 2007 income tax returns, which Rosemary offered into evidence at the final trial in October 2008.

**{¶38}** The magistrate found that in 2006, John earned $246,660, had $33,737 in itemized deductions, and owed a federal tax of $66,142.   That same year, Rosemary earned $222,488, had $44,854 in itemized deductions, and owed federal tax of $47,361.  Both parties claimed all five children in 2006.

{¶39} For 2007, John "reported gross wages" of $3,846, and had an adjusted gross income of $13,788. He did not claim the children in 2007, and overpaid $829 in federal taxes. In 2007, Rosemary earned wages of $360,533, with an adjusted gross income of $368,661. She had $37,095 in itemized deductions, and owed a federal tax of $88,928. She claimed the children in 2007.

{¶40} The magistrate found that after John was rehired in late 2007, he began earning $200,000, which was his annual salary at the time of the final divorce hearing in October 2008. Rosemary earned $360,333 at that time.

{¶41} The magistrate determined that John should claim the children for 2006, and Rosemary should claim the children for 2007. Beginning in 2008, the magistrate decided that the parties should alternate claiming two children and three children. For 2008, the magistrate ordered that Rosemary claim three children and John claim two. For 2009, John should claim three children and Rosemary claim two, and so on.

{¶42} Rosemary first argues that the trial court and the magistrate erred because the magistrate did not preside over the final trial and, thus, she could not "render judgment on transcript when witness credibility [was] a factor; as credibility determinations require the trier of fact to observe testimony." She further maintains that "a court cannot take judicial notice of facts that are in dispute." She relies on Civ.R. 63 (regarding disability of a judge), Evid.R. 201(B) (kinds of facts that may be judicially

noticed), and *Vergon v. Vergon*, 87 Ohio App.3d 639, 622 N.E.2d 1111 (8th Dist. 1993).

**{¶43}** We find her arguments unpersuasive. The magistrate did not take judicial notice of facts that were in dispute, or make any credibility assessments from reading a transcript. It took judicial notice of the retired judge's factual findings and judgment that had been journalized in November 2008, as well as copies of the parties' 2006 and 2007 income tax returns — that she submitted into evidence.

**{¶44}** Evid.R. 201(B) provides that a court may take judicial notice of facts "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Although the facts in this case were hotly in dispute throughout the case, the trial judge who presided over the trial determined the issues after viewing the evidence and deciding the credibility of the witnesses. We find no abuse of discretion.

**{¶45}** Rosemary further claims that under Civ.R. 63, the magistrate was required to "read and review the entire record in the matter as of November 12, 2008; and certify on the record that she [had] familiarized herself with the record and [was] satisfied that she [could] proceed." We disagree with Rosemary's interpretation of this rule. Civ.R. 63(A) requires a judge to certify on the record that he or she has familiarized himself or herself with the record, but Civ.R. 63(A) applies to jury trials, not bench trials. Civ.R.

63(B), which does apply, does not require a judge to certify anything on the record. It provides that

> If for any reason the judge before whom an action has been tried is unable to perform the duties to be performed by the court after a verdict is returned or findings of fact and conclusions of law are filed, another judge designated by the administrative judge, or in the case of a single-judge division by the Chief Justice of the Supreme Court, may perform those duties; but if such other judge is satisfied that he cannot perform those duties, he may in his discretion grant a new trial.

**{¶46}** Rosemary also contends that in *Vergon*, this court reversed "the trial court's decision when there was no agreement of the parties to the successor judge determining the remaining issues, and no indication that the successor judge was familiar with the prior proceedings when he took over the case." But the reason we reversed the decision of the trial court in *Vergon* was that the judgment entry of divorce (signed by the successor judge) differed "significantly from the memorandum opinion written by the [retired] judge who heard the evidence and was an adoption of the plaintiff's proposed findings of fact." *Id.* at 643. Here, the magistrate simply copied the findings of the judge and exhibits that Rosemary had placed into evidence.

**{¶47}** Rosemary further argues that the trial court erred in adopting the magistrate's decision because the magistrate did not properly determine what was in the best interest of the children when allocating the tax exemptions under R.C. 3119.82. We agree.

**{¶48}** The magistrate stated that she took judicial notice of the "United States Tax Code." After the magistrate determined the respective incomes, deductions, and tax owed by the parties, but before deciding who should receive the exemptions, she stated:

> In 2007, Plaintiff would phase out of the child tax credit due to her high income and Defendant would be partially phased out of the credit due to his low income. Both parties would still benefit approximately the same from five exemptions. Otherwise, both parties' phase out of the benefit of the child tax credit due to their high incomes.

**{¶49}** In making the determination, the magistrate had to consider

> any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children. R.C. 3119.82.

This statute goes beyond a mere comparison of the net tax savings of each parent in determining the best interest of a child.

**{¶50}** The dependent child tax exemption "allows a parent to deduct a fixed dollar amount from his or her gross income for each dependent child claimed on the federal income tax return." *In re Criner*, 7th Dist. No. 99 BA 57, 2001 WL 1004243. Tax refunds are not representative of this number, nor are they indicative of the net tax benefit the deduction may provide due to eligibility for other deductions, credits or exemptions that are contingent on the ability to claim an eligible dependent. *Cawrse v. DiLallo*, 6th Dist. No. L-06-1329, 2007-Ohio-3684, ¶ 35.

**{¶51}** In *In re J.H.*, 7th Dist. No. 10JE15, 2011-Ohio-6536, ¶ 17-18, the court explained:

> [W]hen the lower court considers the net tax benefit to each parent, it must look at the tax brackets of each parent. *Evangalista v. Horton*, 7th Dist. No. 08 MA 244, 2011-Ohio-1472, ¶ 74-75. While there are a variety of factors that determine a person's tax liability other than the tax bracket, this factor is certainly determinative in awarding the dependency exemption. *Id.* at ¶ 74. This factor determines the net benefit of the exemption itself because it sets the value of the exemption to each party. The actual value of the dependent child exemption is the amount of the exemption in that tax year, multiplied by the rate of taxation paid by the party.
>
> The net value of the deduction itself, however, does not determine the total tax benefit under either [*Singer v. Dickinson*, 63 Ohio St.3d 408, 414, 588 N.E.2d 806 (1992)], or R.C. 3119.82, because while the net value of the ability to claim the exemption may be greater for the party who has higher income (presuming that the individual with greater income pays tax at a higher rate), the party with the lower income may be eligible for other credits, deductions, or exemptions by virtue of the ability to claim a dependent child. This may result in a greater total tax savings due to that dependent child. For this reason, the lower court's inquiry must include not only the tax brackets of both parents, but also evidence "concerning whether or not the parties have other exemptions or deductions or taxable income, whether each party could file joint income tax return, whether or not either party has income that impacts the relevant federal, state, and local income tax rates" and any tax credits available to the parties both with and without the ability to claim the child as a dependent. *Boose v. Lodge*, 3d Dist. No. 6-03-04, 2003-Ohio-4257, ¶ 9; see also *Foster v. Foster*, 6th Dist. No. S-03-037, 2004-Ohio-3905, ¶ 21. Again, these are discrete numbers which may be ascertained by examining the credits, deductions, or exemptions available in the relevant tax year, and this information, in combination with evidence of gross income from all sources, must be provided to the court pursuant to *Singer* and R.C. 3119.82. Tax refunds, projected tax burdens, and estimated quarterly payments, especially those for the following tax year, are not relevant.

{¶52} For the year 2006, the amount a person could deduct for each exemption was reduced (*not completely phased out*) once that person's adjusted gross income ("AGI") went above a certain level, depending on the person's filing status. *See* Publication 501 ("Exemptions, Standard Deduction, and Filing Information"), Internal Revenue Service's ("IRS"), 2006, 19. If a person's adjusted gross income was above this certain level, depending on that person's filing status, each exemption could "lose no more than 2/3 of the dollar amount of [the] exemptions." *Id.* In 2006, each exemption was worth $3,300 and, thus, could not be reduced by more than $1,100. *Id.*

{¶53} Based upon our calculations using the parties' 2006 1040 tax returns, John's filing status for 2006 was married filing separately, and Rosemary's was head of household.[2] Using these filing statuses under Publication 501, Rosemary had to make under $188,150 to receive the full deduction for exemptions, and John had to make under $112,875 to receive the full deduction. Because they both earned more, the amount they could receive for each exemptions was reduced pursuant to a calculation. But each exemption, which was worth $3,300 in 2006, could "lose no more than 2/3 of the dollar amount of [the] exemptions."

{¶54} Although John was in the higher tax bracket, Rosemary received the higher net tax benefit as head of household due to the 2006 tax rules for phasing out exemptions.

---

[2] We are using the parties' actual 2006 filing status to make this determination. But they could amend their tax returns, using a different filing status, which would alter these calculations. If so, it would be their burden to establish such to the trial court.

Using Worksheet 2 in the 2006 Publication 501, Rosemary received a $15,576 deduction from her AGI for herself and the five children, and John only received a $6,600 deduction for himself and the five children (this is in fact what each of them deducted for the exemptions). Using the IRS's 2006 tax rate schedule to determine the amount of federal tax each party owed from their taxable income (AGI minus deductions), Rosemary lowered her amount of tax owed by almost $5,000. John, however, only lowered the amount of tax he owed by approximately $2,300. Accordingly, by using the parties' 2006 filing statuses, this factor (net tax benefit) weighs in favor of giving Rosemary all five exemptions for 2006.

{¶55} Another factor that courts must consider under R.C. 3119.82 is the "relative financial circumstances and needs of the parents and children." Rosemary filed for divorce in January 2006. The parties lived together, sharing expenses, until late October 2006. In May of that year, the trial court issued a temporary order stating that both parties share all expenses. Based on the November 2008 judgment entry of divorce, the trial court found (and we have affirmed here, *supra*) that for 2006, John owed Rosemary a temporary support arrearage of $10,531.70. Thus, this factor weighs in favor of giving Rosemary the exemptions for 2006.

{¶56} The other factors that courts must consider, "the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit," are negligible in this case. The

parties lived together until late October and, thus, saw the children equally for most of the year. They made too much money to receive any earned income tax credit. Neither claimed any other credits in 2006, except Rosemary did receive a $1,200 child care credit. Even assuming that John should receive the benefit of some of that credit, considering he owed an arrearage that included (at least in part) reimbursing Rosemary for child care expenses, we still find it to be negligible — especially considering the fact that the trial court waived the total arrearage that John owed Rosemary for 2006, 2007, and 2008.

{¶57} Thus, after reviewing the record before us (and using the parties' 2006 income tax returns[3]), we find that in determining what was in the best interest of the Brownlee children for that year, the R.C. 3119.82 factors weighed more heavily in allocating the dependency exemptions to Rosemary. The magistrate did not give any reason for allocating the exemptions to John. We can only speculate that the magistrate did so because John earned more income that year, putting him in a higher tax bracket. But as we determined, John did not receive the higher net tax benefit from the exemptions. Thus, the record does not support the magistrate's decision. Plus, net tax benefit is not the only factor, and there is no indication in the record that the magistrate considered any of the other factors.

---

[3]Again, if the parties amended their filing status for 2006, this calculation might change. If so, it is their burden to request a modification from the trial court. Either way, it is clear that the magistrate, and ultimately the trial court by adopting the magistrate's decision, did not properly apply the 2006 tax laws.

**{¶58}** Accordingly, we conclude the magistrate's decision regarding allocation of the tax dependency exemptions for 2006, and the trial court's adoption of it, to be an abuse of discretion because it was unreasonable to give them to John. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAA Ents., Inc. v. River Place Comm. Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶59}** As for 2007, the trial court correctly allocated the dependency exemptions to Rosemary because John did not owe any federal tax for that year.

**{¶60}** As for dividing the allocations between two and three children for 2008, and then alternating the number of exemptions between two and three children each year, we also find that the trial court abused its discretion in adopting the magistrate's decision. The magistrate reasoned that in 2007, Rosemary "would phase out of the child tax credit due to her high income and defendant would be partially phased out of the credit due to his low income. Both parties would still benefit approximately the same from five exemptions." The magistrate then stated, "Otherwise, both parties' phase out of the benefit of the child tax credit due to their high incomes." Although the magistrate was initially referring to 2007, we construe the word "otherwise" in the last sentence to mean that the magistrate was referring to future years of income (because John clearly did not have a high income in 2007, but was on track to make $200,000 in 2008). Thus, the

magistrate determined that neither party would really benefit from the exemptions, because they were phased out at their high incomes.

{¶61} But again, a cursory review of Publication 501 for 2008 establishes that just like in 2006, the amount a person could claim as a deduction for each exemption was reduced once that person's AGI went above a certain level, but it was not completely phased out. Publication 501 further explains how the reduction worked, and made clear that a person could lose "no more than 1/3 of the dollar amount of [the] exemptions." In 2008, each exemption was worth $3,500, and thus could only be reduced by a maximum of $1,167. Thus, it is clear that the magistrate did not properly apply the tax code for 2008 (and beyond).

{¶62} Further, the trial court found in the November 2008 judgment entry of divorce that after John moved out of the marital home and throughout the divorce proceedings, "his possession time [with the children] ha[d] been extremely limited." This was because John did not have a "dwelling that [could] accommodate all of the children." So he did not have overnight visits. Thus, the evidence established that Rosemary had possession of the children significantly more than John in 2007 and 2008, a factor the magistrate should have considered when allocating the tax exemptions for 2008.

{¶63} The magistrate should have also heard additional evidence as to what the parties ultimately earned in 2008, as well as other tax considerations, to decide who

should have received the tax exemptions for 2008. The final divorce hearing took place in October 2008, with the judgment entry of divorce issued on November 12, 2008. By the time the magistrate held the hearing on the tax exemption allocations for 2008, it was late 2010. At that time, according to the transcript, the magistrate believed she had a limited mandate from this court to allocate the tax exemptions as of the date of the November 2008 judgment. But this court had dismissed the first appeal for lack of final appealable order (albeit because the trial court failed to allocate the tax exemptions). Without a final appealable order, the matter was not final and, thus, the magistrate could have (and should have) taken additional evidence regarding the issue of allocating the tax exemptions for the 2008 tax year and into the future.

{¶64} Accordingly, we conclude that the trial court abused its discretion when it adopted the magistrate's decision with respect to allocating the 2006 tax dependency exemptions and for 2008 and beyond.

### Evidentiary Hearing

{¶65} In her fifth assignment of error, Rosemary argues that the trial court erred by issuing judgment entries on July 18, 2011, and two on July 20, 2011, without holding an evidentiary hearing.

{¶66} After this court dismissed the first appeal for lack of a final appealable order, the parties filed numerous motions relating to all kinds of matters. As of May 2011, there were some 17 motions pending. The magistrate set a date for a hearing on

all motions for May 16, 2011. But the parties settled all matters and informed the magistrate that they would submit an agreed judgment entry to the court, which they did. Rosemary objected to John's proposed agreed judgment entry, claiming it did not set forth the terms as the parties had agreed.

{¶67} The trial court issued its order disposing of all motions on July 18, 2011. Rosemary moved to vacate the order, arguing that the trial court's judgment did not reflect what the parties had agreed to. The trial court overruled Rosemary's objections to John's proposed agreed judgment entry, and denied her motion to vacate. Rosemary appealed this entry.

{¶68} We find merit to Rosemary's argument that the trial court should have held an evidentiary hearing regarding the terms of the parties' settlement agreement relating to visitation between John and the children. In *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 683 N.E.2d 337 (1997), syllabus, the Ohio Supreme Court held: "Where the meaning of terms of a settlement agreement is disputed * * *, a trial court must conduct an evidentiary hearing prior to entering judgment." Here, Rosemary and John submitted separate judgment entries purporting to convey what they agreed to. Rosemary objected to the entry that John submitted. After the trial court issued its judgment regarding the terms of John's visitation, Rosemary moved the trial court to vacate its judgment, which it denied. Rosemary contends that the trial court issued an entry that conflicts with the

parties' actual agreement and, thus, should have held an evidentiary hearing on her motion to vacate to determine the terms of the agreement. We agree.

{¶69} Rosemary also argues that the trial court erred when it disposed of two of her motions (motion to terminate shared parenting and motion for attorney fees relating to the same motion) that she had voluntarily dismissed with prejudice. But the trial court did not dispose of these two motions in any of the judgment entries that she appealed.

{¶70} Accordingly, Rosemary's fifth assignment of error is sustained in part and overruled in part.

Manifest Weight of the Evidence

{¶71} In her sixth assignment of error, Rosemary contends that the trial court's "decisions are against the manifest weight of the evidence." In support of this argument, Rosemary incorporated "the facts, law and argument set forth" in her brief, with no other argument. Because we already addressed the arguments set forth in her brief, Rosemary's sixth assignment of error is overruled.

{¶72} Judgment affirmed in part, reversed in part, and remanded. With respect to the tax dependency exemptions, the trial court is instructed to issue a judgment that is consistent with this opinion regarding the 2006 tax year, and hold an evidentiary hearing to address the tax allocations for 2008 and beyond. The trial court is further instructed to hold an evidentiary hearing to determine what the parties agreed to in May 2011, if they agreed at all, regarding John's visitation with the children.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR